[No. 1701.]

BILL MADISON v. THE STATE.

1. PRACTICE — ENTRY OF JUDGMENT NUNC PRO TUNC.— If, at a trial term, the court from any cause fails to enter judgment and pronounce sentence upon a conviction had during the term, the judgment may be entered and sentence pronounced at any succeeding term of the court, unless a new trial has been granted or the judgment arrested, or an appeal has been taken.

2. SAME.— In cases where an appeal has been taken, though no final judgment was entered, and the appeal is dismissed, it is the proper practice to cause the final judgment to be entered at a subsequent term, in the court *a quo*, *nunc pro tunc*, and from this judgment the defendant may again prosecute appeal.

3. SAME — NOTICE.— It is a statutory rule of civil practice that "notice of motions in a suit pending is to be given by the filing of the motions and the entry thereof on the motion docket during the term. But if the motion does not relate to a pending suit, and if the time of service is not elsewhere prescribed, the adverse party shall be entitled to three days' notice."

4. SAME.— That. until a judgment final and valid is rendered, the suit is st ll pending, and therefore no notice of any motion relative thereto is necessary, is a doctrine which cannot apply to a case in which there has been an at-tempt on the part of the court to make a final disposition of the case by entering judgment. In such case, where action at a subsequent term is sought, the defendant is not presumed to be longer in court and cogniz it of its proceedings, and it is but proper that he should have notice of t ie same.

5. SAME.— It is a fundamental principle, applicable to all proceedings of a co rt of justice at every stage of progress, that whenever a defendant's intere ts are being adjudicated, he has the right to be notified and heard by the co rt making the adjudication. A defendant's appearance for the purpose of b-jecting to the proceeding is neither a waiver of the right to notice nor binding upon the party as a full appearance.

6. SAME.— Our statutes require that notice be given to the parties interested in a judgment or decree before any correction of mistakes or misrecitals in the judgment can be made by amendment. Under the rules announced it is *held* that when, after the dismissal of an appeal for want of a valid final judgment, the State seeks the entry of a proper judgment *nunc pro tunc*, in the court *a quo*, at a subsequent term, the defendant is entitled to notice of the motion filed for the purpose.

APPEAL from the District Court of Jefferson. Tried below before the Hon. W. H. Ford.

The death penalty was assessed in this case upon the capital conviction of the appellant for the murder of Elbert Smith, in Jefferson county, Texas, on the 5th day of April, 1884.

According to the testimony of James Lightfoot, the first witness for the State, the deceased, Elbert Smith, was shot in the eye and killed by the defendant in Jefferson county, Texas, on the night of

Saturday, April 5, 1884. Previous to the killing, the witness had directed his children to tell the deceased, if they saw him, to call at his, witness's, house that night, as he, witness, wanted to see him. Smith came to witness's fence some little time prior to the shooting, which took place about 10 o'clock, and called the witness out. After speaking to Smith about the matter he had in hand (the borrowing of a team and plow), witness turned to go back to his house, and had nearly reached his door, when his little son called his attention to the fact that some other man was at the fence. Witness walked on until he met his wife, and about this time he heard the defendant cursing the deceased violently, and threatening to mash his mouth. Witness's daughter, who was present, appealed to defendant to go away, when defendant, addressing the deceased, said: "Oh, G—d d—n you, wait until I get my gun, and I will put your light out." Deceased was then sitting quietly on a stump. Defendant went home, got his gun, and returned to a point about thirty steps distant from Smith, raised his gun, fired, and shot him. Deceased said nothing at all after he was shot, nor did he fall instantly, but staggered to his feet and was caught by Nora Duffey and Dilcy Lightfoot, who, with witness's wife Nancy, besides the witness, were present. Nora and Dilcy took the deceased home, where he died two days later.

As near as the witness could estimate it, the distance from the defendant's house to the road immediately in front of the witness's house, where the deceased was killed, was about one hundred yards. When the defendant first came to the witness's fence he began to curse and abuse the deceased about some matter of dispute between them with which the witness was not familiar. The deceased made no other reply to the defendant's first abuse than to tell him to go away; that he had done nothing to the defendant. But when the defendant spoke of breaking or mashing his mouth, the deceased remarked: "If you want to mash my mouth so badly, I will come down and give you a chance." Defendant in reply to this said: "Oh, G—d d—n you, stay here until I come back," and went home, returned and killed Smith in the manner stated. Smith was unarmed, made no demonstration towards defendant whatever, and, in the opinion of the witness, had not the least idea that the defendant intended to shoot him. The shooting occurred near, and immediately in front of, the witness's house, in the road, which is forty-two steps distant from witness's house. Some time after the shooting, Si Haynes came up and asked who did it.

Cross-examined, the witness reiterated that the shooting took place

immediately in front of his house, in the public road, about 10 o'clock at night. When he shot, the defendant was on the side of the road next to his house. After the shot, the defendant went to his house and stood on the gallery. When Si Haynes came and asked who did the shooting, defendant said: "Oh, Pa (meaning Si), I told you I would kill some G—d d—d son of a b—h." Witness was standing on a log near a corner of the fence when the shot was fired. When defendant came back with his gun he asked: "Where are you?" Smith said: "Here." Defendant said: "Oh, G—d d—n you, don't I shoot?" and fired. The shooting was done about ten feet from where the witness's fence was usually crossed. The log on which witness stood was about fifteen feet from that crossing. Witness had never threatened to kill the defendant. He never made such a threat to "Curt," or to Si Haynes, or to Ed. or John Haynes. Witness supposed the deceased had on shoes when he was shot. He usually wore heavy nail solid shoes called timber shoes. The shooting was not done in "the path."

Nora Duffey, Dilcy Lightfoot and Nancy Lightfoot, the other parties stated by the witness James Lightfoot to have been present at the time of the shooting, were also sworn and testified for the State. There was no material difference between their narratives and that of James Lightfoot. They located the place of the killing at the same point,— in the road immediately in front of James Lightfoot's house, and declared that the shot was not fired from "the path," and all agreed that it occurred about 10 o'clock at night. Two of the women stated that, when the defendant first accosted the deceased, before he got his gun, he asked the deceased: "What in the h—ll are you talking about me to those women for?" One of the three stated that she asked deceased, while he was sitting on the stump, and while defendant was gone for the gun, what he had done to the defendant, and that he replied to her that he had done nothing to defendant; that the defendant said that he, defendant, was going to kill him, deceased, and that he, deceased, wanted the witness and the others present to remain, so that if defendant did shoot him, they could see and tell who did it. Each of these three witnesses denied that they had ever threatened to kill either the defendant or any of his relatives.

Cyrus Haynes was the first witness for the defense. The deceased, according to his testimony, was killed about two hundred and fifty or three hundred yards south of the witness's house. The road runs by and close to James Lightfoot's fence. The deceased was killed in the road east of Lightfoot's fence, about fifty yards

up the road from where Lightfoot's people get over the fence.
Witness saw the defendant on the night of the homicide. He came
to witness's house early in the night and left there at half-past 10
by the clock. Some time after the defendant left the witness's
house, witness heard the report of a gun, and went to the place of
the firing. On the way witness met the defendant just before he
got into the big road. Defendant told witness that the deceased
came with a crowd, including some women, to mob him, and that
he told them to stand back, which they refused to do, and he shot
the deceased. He mentioned the name "Dilcy." Witness did not
hear him mention the name of any other woman. He said that he
saw there was a crowd intent on mobbing him,— he did not know
what for,— and broke for his house and then for witness's for pro-
tection, and the crowd tried to cut him off; that he was going on the
trail or "path" which quarters from his house to the big road. The
shooting was done from the inside of his pasture, and defendant
must have been some seven or eight steps distant from the road.
From Lightfoot's house to where he gets over his fence, the distance
is over one hundred yards, and Smith was shot at a point fifty yards
above this fence-crossing. Witness saw some wadding in the road
where the defendant fired across it from his fence. Witness saw
also the signs of cork shoes which indicated a scuffle. Signs
of the same kind of shoes were found at the point where the shoot-
ing was done. Witness had known Lightfoot some seven or eight
years, and had heard him threaten to take the defendant's life.
Witness and Curt Vestal met the deceased on his way to town on
the day of the killing. He had a package in his hand, and witness
asked him where he got so much money. He said the package did
not contain money but shot. Vestal took hold of the package, and
asked him what he was going to do with shot. He replied that he
would show what he would do with it; that if Bill Madison ever
put his foot in his yard again, he would kill Madison if it was the
last thing he ever did. Vestal remarked: "You are getting bad
in your old days. You are old to turn desperado."

Witness asked defendant, when he met him after the shooting,
what the deceased did. He replied that deceased and his mob walked
up to him and said: "Look here, you have watched me and these
girls long enough;" that he, Madison, denied having watched him,
and that deceased then walked nearer to him and called him a "d—d
black son-of-a-b—h," and rubbed his fist in his, Madison's, face; that
he then saw a mob of five or six coming up, and he started to wit-
ness's house. The trail or path goes into the big road at the point

where the shooting was done. The defendant said that when accosted by the deceased he was traveling that trail inside of his own fence. That fence was six rails high. Witness did not himself see Smith that night, but heard a great deal of talking on that trail.

The wadding spoken of by witness was lying in the road in the range of the point from where the defendant said he stood when he fired. It did not look as though it had been blown to that point (which was north of Lightfoot's house) by the wind. There were several pieces of wadding on the ground, and they lay in a straight line. The distance back to Lightfoot's house from this point was about one hundred and forty yards. The defendant was the son-in-law of the witness.

Mrs. Haynes, the wife of the last witness, testified for the defense that defendant came to their house early in the night on the night of the shooting, and remained until half-past 10 o'clock. Witness heard the shot, but did not know how long it was after the defendant left. She went to the place of the shooting, reaching it after her husband. Witness asked defendant about the matter. His answer and account of the transaction as related by this witness coincide with the narration of her husband. Witness saw Nora and Dilcy in the crowd, and heard Nora say: "Well, Bill, we started after you to-night and did not get you, but if you will step out here now we'll get you — d—n you." This was said while witness and defendant's wife were taking defendant home. Witness knew about where the shooting took place. The shot must have been fired from the inside of defendant's pasture, judging from the manner in which the wadding lay across the road. Tracks showed where the party came down the road. The shooting was done above James Lightfoot's house. Witness could have seen the deceased if she had gone to where he lay in the trail or path which led to Mr. Kennedy's, as she heard him groaning, but she did not go.

The defendant's wife testified, in his behalf, that she stood on her gallery and saw the shooting. At the time of the shooting the defendant was standing in the path inside of his own fence, and the deceased stood in the big road some ten or twelve steps from the corner of the fence. Witness saw the defendant, deceased, Nora, Dilcy, Nancy, Jim (Lightfoot), and a boy whom she did not know. Just before the shooting witness heard the deceased cursing the defendant, and heard him say to defendant: "You d—d black son of a b—h, you won't do anything you say you will." She heard the defendant say three or four times: "Stand back, stand back, Elbert, or I will hurt you." Witness and her mother took defendant home

by way of the small path. Witness heard Dilcy say: "Bill Madison, being as we started after you to-night and didn't get you, if you will step out here now, d—n you, we'll finish you." Witness saw wadding across the road next day at the point where the shooting was done.

Witness remembered the defendant's coming to the house and getting the gun. Notwithstanding she swore on the examining trial that she did not see the shooting, the witness now swears positively that she did see it. She was standing on the gallery at the time. This witness reiterated, again and again, that the shooting took place at the point described by her and the witness Haynes, and maintained that it did not occur at the place asserted by the witnesses for the State.

Mrs. Sibbie Cole testified that she knew nothing whatever about the shooting. If a foot print pointed out to her at the corner of defendant's fence was the deceased's he must have been going up the road with his face towards the defendant's pasture. Some time during the March of 1884, witness heard Lightfoot threaten defendant's life. Witness was passing Lightfoot's house on that occasion, and Lightfoot stopped her, and told her that defendant had been to him about his daughter, and that he intended to kill defendant if it was the last thing he ever did. Witness replied that such was not the proper course to pursue; that he should make his daughter, who caused more trouble in the neighborhood than anybody else, stay at home, and he would get along with people. The witness knew Dilcy and Nora. They bore bad reputations for truth and respectability, as did all of the Lightfoot family. Witness would believe none of them on oath.

Eddie Haynes, defendant's brother-in-law, testified, for the defense, that he once heard Lightfoot say that he intended to kill the defendant.

Nora Duffey was called by the State in rebuttal. She testified that the defendant had been engaged in working on the river, and wore cork-soled shoes. Witness did not know what kind of shoes he had on on the night of the homicide. The deceased was sitting on the stump when the witness joined the party just before the shooting. Defendant was not present when witness first joined the party. When he did come up he deliberately shot the deceased. Witness was present. Deceased did not even have a knife on his person. No one was "after" or following the defendant when he did the shooting. Witness did not "have anything against the defendant."

Edmund Moore testified, for the State, that he had known James, Nancy and Dilcy Lightfoot and Nora Duffey for a very long time, and knew their reputation for truth and respectability in the neighborhood. In the case of each one of them it was quite good.

The motion for new trial presented the questions discussed in the opinion.

*O'Brien & John*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. At our last Tyler term, 1884, the appeal in this case was dismissed on motion of the assistant attorney general because the record did not show that a valid final judgment had been entered against appellant. After said dismissal in this court, and at the following term of the district court of Jefferson county, the district attorney, on the 15th day of November, 1884, filed his motion in said district court to have a proper final judgment of conviction entered *nunc pro tunc*. On the 28th of November, defendant filed objections to the said motion, one of which was that no notice of said motion had ever been served upon him. These objections were overruled by the court, and the motion of the district attorney was sustained, and a final judgment *nunc pro tunc* was rendered and entered. Defendant saved his bill of exceptions to the action of the court, and assigns the same for error.

It is provided by statute that "where from any cause whatever there is a failure to enter judgment and pronounce sentence upon conviction during the term, the judgment may be entered and sentence pronounced at any succeeding term of the court, unless a new trial has been granted or the judgment arrested, or an appeal has been taken." (Code Crim. Proc., art. 797.) Under this provision it has been held that if an appeal has been taken, but no final judgment was entered, and the appeal is dismissed, it is the proper practice to cause the final judgment to be entered at a subsequent term in the court *a quo, nunc pro tunc*, and that from this judgment the defendant may again prosecute appeal. (*Smith* v. *The State*, 1 Texas Ct. App., 408; *Mapes* v. *The State*, 13 Texas Ct. App., 85; *Vestal* v. *The State*, 3 Texas Ct. App., 648.) In civil practice, "notice of motions in a suit pending is given by the filing of the motion and entry thereof in the motion docket during the term." (Rev. Stats., art. 1454.) But "where a motion does not relate to a pending suit, and where the time of service is not elsewhere prescribed, the ad-

verse party shall be entitled to three days' notice of the motion."
(Rev. Stats., art. 1456.)

It may be insisted that until a judgment final and valid is ren-
dered the suit is still pending, and therefore no notice of any motion
relative thereto is necessary. This, however, is not the rule where
there has been an attempt on the part of the court to make a final
disposition of the case by entering judgment. In such case, where
action at a subsequent term is sought, the defendant is not presumed
to be longer in court and cognizant of its proceedings, and it is but
proper he should have notice of the same. (*Coffee* v. *Black*, 50 Texas,
117.) Whenever a defendant's interests are being adjudicated, he has
the right to be notified and heard by the court making such adjudi-
cation. "This is a fundamental principle applicable to all proceed-
ings of a court of justice at every stage of their progress." And
an appearance for the purpose of objecting to the proceeding is
neither a waiver of the right to notice nor binding upon the party
as a full appearance. (*De Witt* v. *Monroe*, 20 Texas, 289.) "Our
statutes require that notice be given to the parties interested in a
judgment or decree before any correction of mistakes or misrecitals
in the judgment can be made by amendment." (Rev. Stats., arts.
1354, 1355; *Williams* v. *Nolan*, 58 Texas, 708; *Russell* v. *Miller*,
40 Texas, 494; *Blalock* v. *The State*, 3 Texas Ct. App., 376; *Collins*
v. *The State*, 16 Texas Ct. App., 274.)

We will not go into a discussion of the other questions. Because
the final judgment *nunc pro tunc* was rendered against appellant
without notice, the judgment is reversed and the cause remanded
that a proper judgment *nunc pro tunc* may be rendered.

*Reversed and remanded.*

[Opinion delivered January 31, 1885.]